**This order is SIGNED.**



**Dated: May 9, 2018**

KEVIN R. ANDERSON
U.S. Bankruptcy Judge

---

| IN THE UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF UTAH | |
| --- | --- |
| In re:<br><br>RONALD JAY AND CHAROLETT KAY<br>REYNOLDS,<br><br>Debtors. | Bankruptcy Number: 16-22038<br><br>Chapter 7<br><br>Hon. Kevin R. Anderson |
| **MEMORANDUM DECISION ON APPLICATIONS<br>FOR COMPENSATION (DOCKET NOS. 76 AND 81)<br>AND FINAL REPORT (DOCKET NO. 80)** | |

The matters before the Court are: (1) the First and Final Application for Allowance of

Attorney Fees and Costs (the "Special Counsel's Application") filed by Prince, Yeates &

Geldzahler; (2) the Chapter 7 Trustee J. Kevin Bird's Proposed Final Report ("Final Report"); and

(3) the Trustee's Application for Compensation and Reimbursement of Expenses (the "Trustee's

Application").[1] The Court held an initial hearing on Special Counsel's Application on December

18, 2017. Adam S. Affleck appeared on behalf of Prince, Yeates & Geldzahler ("Special

---

[1] Docket Nos. 76, 80, and 81 respectively. All future references to the docket will be to Case No. 16-22038 unless
otherwise specified.

Counsel"). The Court continued the hearing without date, subject to the Trustee filing a proposed final report.

On January 22, 2018, the Court held an evidentiary hearing on Special Counsel's Application, the Trustee's Application (the "Applications"), and the Final Report. Adam S. Affleck appeared for the Trustee and Prince, Yeates & Geldzahler. The Court received the proffer of testimony from Special Counsel. At the conclusion of the hearing, the Court took the matter under advisement.

For the reasons set forth herein, the Court denies the compensation requested in Special Counsel's Application except for $2,896.00 in fees and $853.44 in costs, for a total of $3,749.44. The Court grants the Trustee's Application in the requested amount of $4,519.72. The Trustee is to amend and resubmit the Final Report for Court approval.

## I.      Introduction

In this case, the Trustee collected a tax refund and sold two recreational lots that netted $18,019.72 to the estate. However, the Trustee and his counsel are seeking compensation totaling $27,594.66. Thus, unless otherwise adjusted, professional fees will empty the estate leaving nothing for unsecured creditors.

This was not a difficult case, and it did not involve complex legal issues, transactions, or assets. So how did the estate become administratively insolvent by over $9,500? From the Court's perspective, there are four reasons. First, the Trustee and Special Counsel did not accurately assess the value of the lots at the beginning of the case. Second, the Trustee did not budget and monitor Special Counsel's legal expenses. Third, Special Counsel performed tasks that should have been done by the Trustee or the realtor. And fourth, the time spent by Special Counsel performing services was unreasonable given the routine nature of the tasks and the results achieved. For these reasons, the Court makes the following adjustments to the Applications.

## II.      Jurisdiction, Venue & Notice

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a). Special

Counsel's Application, the Trustee's Application, and the Final Report are core proceedings within

the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is appropriate in this District under 28 U.S.C. §

1408 and § 1409.

## III.    Facts

The facts arise in an unremarkable Chapter 7 consumer case. The Debtors filed their case

on March 16, 2016, and J. Kevin Bird was appointed as the Trustee. The assets administered by

the Trustee consisted of a tax refund[2] and two recreational lots in central Utah ("Lot #9" and "Lot

#11" or collectively the "Lots").[3]

Just before the petition date, the Debtors sold Lot #9 to Gary Black for $1,000.[4] The Trustee

viewed this sale as an avoidable transfer. The Debtor's bankruptcy schedules listed Lot #11 with

a value of $25,000, but subject to a lien for $35,550.[5] During the year before their bankruptcy

filing, the Debtors unsuccessfully attempted to sell the Lots for $80,000.[6] The Trustee thus

assumed that each lot was worth $40,000, and that the recovery of Lot #9, coupled with a

subsequent sale of both Lots, would benefit the estate.[7] The Trustee also thought there might be

---

[2] The Trustee recovered $2,394.35 in tax refunds.

[3] The two undeveloped, recreational lots are designated as Lot #9 and Lot #11 of the Pine Creek Ranch Subdivision located at the mouth of a canyon near Mt. Pleasant, Utah.

[4] Docket No. 11, Statement of Financial Affairs, part 7, question 18.

[5] Docket No. 11, Schedule A/B: Property and Schedule D: Creditors Who Have Claims Secured by Property.

[6] Docket No. 85, Supplement to First and Final Application for Allowance of Attorney Fees and Costs ("Supplement"), p. 4; Docket No. 61, Motion for Approval of Settlement Agreement, p. 2.

[7] Docket No. 85, Supplement, p. 4.

cause to object to the Debtors' discharge because they may have undervalued the Lots and/or they may have sold Lot #9 with fraudulent intent.[8]

The Trustee initially hired his law firm as general counsel.[9] Shortly thereafter he employed Prince, Yeates & Geldzahler as "special counsel" to assist in the investigation of actions, including a possible objection to the Debtors' discharge, and to represent the Trustee in actions involving estate property, including the recovery of Lot #9.[10]

In June 2016, the Debtors provided the Trustee and Special Counsel with material information regarding the nature and value of the Lots. Specifically, the Debtors provided the 2015 property tax assessments showing Lot #11 with a value of $25,000 and Lot #9 with a value of $660.[11] They also included a plat map showing that a main access road cuts Lot #9 in half.[12] Lastly, they listed a multitude of specific reasons why Lot #9 was worth so much less than Lot #11, including its location on a steep hill that drops into a stream.[13] In summary, the Debtors argued

---

[8] Docket No. 23, Trustee's Motion to Extend Deadline for Filing Complaint Pursuant to 11 U.S.C. § 727, p. 2, ¶ 8-9.

[9] Docket No. 15, Order Authorizing Employment of Attorney for Trustee.

[10] Docket No. 19, Trustee's Ex Parte Application for Order Authorizing Employment of Special Counsel, p. 1-2, ¶ 2.

[11] Docket No. 28, Debtor's Objection and Response to Trustee's Motion to Extend Deadline for Filing Complaint Pursuant to 11 U.S.C. § 727.

[12] Id.

[13] Id. at p. 6. The Debtors' response includes an email stating:

> Here are the mls listings with history, pictures showing cliff, plat map showing A9 is the only lot of 252 in PCR (Pine Creek Ranch) that is cut in half and the tax report showing the value of $660 by the county. The county shows A11 as $25,000. Other notes.
>
> A9 - it took years to sell the lot for $9,000
>
> A9 - cannot drive to the property in the winter time
>
> A9 - needed to be sold in the wintertime March —that is like buying a snowmobile in August that you cannot drive up to and look at- not a sellers' market, people are not even looking
>
> A9 - the ½ of the lot south of the road is "Billy Goat" steep.
>
> A9 - the neighboring cabin is about 20' from the property line giving it a "suburban home feel/look". Not secluded.
>
> A9 - all of the north property line along the stream is a 50' cliff straight down to the rocks & water. Most mother's or grandmother's say "NO Way to being next to a cliff". No fences allowed in Pine Creek.
>
> A9 - is on the outside curve of the stream so the cliff continues to erode.

that the geographic attributes of Lot #9 make access, utility connections, and cabin construction

difficult, if not impractical.

From July through September 2016, Special Counsel attempted to determine the value of

the Lots by consulting with a realtor and communicating with Gary Black. Pre-petition, Mr. Black

had unsuccessfully listed the Lots for sale, and he later purchased Lot #9 for $1,000.

During the rest of 2016 and into 2017, Special Counsel conducted discovery as to the

recovery of Lot #9 and engaged in multiple communications and actions to sell the Lots.[14] In June

2017, the Trustee reached a settlement with Gary Black to recover Lot #9 in exchange for a refund

of the $1,000 purchase price.[15] In August 2017, the Trustee sold both Lots for $60,500.[16] From the

sale proceeds the Trustee paid closing costs, taxes, HOA fees, realtor's commission, the lien on

Lot #11, and $1,000 to Gary Black, resulting in net proceeds of $15,846.34.[17]

The Final Report discloses net receipts of $2,394.35 in tax refunds and $15,846.34 from

the Lots, less bank fees of $220.97, resulting in a present balance on hand of $18,019.72.[18] Based

on gross receipts of $62,894.35, the Trustee could seek a commission under 11 U.S.C. § 326(a)[19]

---

A9 - to build a cabin you need to have a septic system and leech field at least 100' feet from the stream. This means it would need to be right next to the road on the south, uphill from the cabin and maybe deeper due to the cliff and not wanting waste to leech out the cliff face. Making it more expensive and maybe not do-able at all. Then your driveway has to cross over the septic system which can cause it to cave in and not function properly.

A9 - for this "buffer" area lot you continue to pay $354 a year in HOA dues.

A9 - PCR only allows camp trailers for two weeks then you have to have them off the lot for at least 4 days. Not a good trailer lot.

[14] Docket No. 76, Special Counsel's Application, Ex. C.

[15] Docket No. 61, Motion for Approval of Settlement Agreement.

[16] Docket No. 75, Trustee's Report of Sale.

[17] *Id.*

[18] Docket No. 80.

[19] All subsequent chapter and section references herein are contained in Title 11 of the United States Code unless otherwise identified.

in the amount of $6,394.72.[20] However, the Trustee's Application and Final Report only seeks $4,484.72 in compensation. Special Counsel seeks $22,221.50 in attorney's fees and $853.44 in costs, for a total of $23,074.94.[21] Special Counsel's Application shows no evidence of billing judgment.[22] In sum, the professionals seek a total of $27,594.66 in administrative fees and costs, yet the estate only has $18,019.72 in funds. The estate is thus administratively insolvent in the amount of $9,574.94.

## IV.    Standard of Review for Applications for Compensation by the Trustee and His Professionals

### A.    The Court's Duty to Review Fees

The Court has an independent duty to review applications under § 330(a)(2) without regard to whether any party objects.[23] A primary purpose of the court's review is to safeguard the integrity of the bankruptcy system and to maintain the public's confidence that bankruptcy cases are economically administered for the benefit of creditors rather than estate professionals.[24] As noted by one court:

> We frequently read in newspaper stories that the public has a perception that bankruptcies are too expensive and that high professional fees are a significant cause of these high expenses. Nothing better serves to allay these perceptions and fulfill public expectations than the recognition that a bankruptcy judge, before a fee

---

[20] Docket No. 81, Trustee's Application.

[21] Docket No. 76, Application; Docket No. 85 (Supplement); Docket No. 87 (Second Supplement).

[22] After the hearing on January 22, 2018, Special Counsel offered to reduce its fees from $22,221.50 to $12,646. (Docket No. 87). However, this is simply the difference between the fees requested and the funds available – which still leaves nothing for unsecured creditors. As explained more fully below, the Court does not view this as a good faith reduction.

[23] *In re Bird*, 577 B.R. 365, 373-74 (10th Cir. BAP 2017) ("When a professional submits an application for compensation, § 330 requires a bankruptcy court to independently review the requested fees and expenses, regardless of whether any objection has been made to the application.").

[24] *Id.* at 374 ("[The] court has an obligation to see that bankruptcy estates are administered efficiently and economically for the benefit of creditors."); *In re Scoggins*, 517 B.R. 206, 221 (Bankr. E.D. Cal. 2014) ("[W]hat is the harm in a disproportionate trustee or professional fee if nobody objects? The harm is the loss of public confidence in the integrity of the bankruptcy system if it comes to be regarded as managed primarily for the benefit of those who operate it.").

application is approved, is obliged to carefully review same and find it personally acceptable, irrespective of the (always welcomed) observation of the UST or other interested parties.[25]

When an estate is administratively insolvent, the Court's duty to review applications for

compensation is particularly purposeful.

### B. The Trustee's Duty to Economically Manage the Estate for the Benefit of Unsecured Creditors

The trustee has the ultimate responsibility to see that estates are economically administered

for the benefit of unsecured creditors. This includes supervising and managing estate professionals

to verify that their services are necessary and reasonably likely to benefit unsecured creditors. As

stated by Judge Leif M. Clark:

> There is one trustee "duty" that can never be delegated, and for which the trustee must *always* be held accountable—and for which trustees should justifiably be compensated, even if all actual work is being performed by others. The trustee and only the trustee is ultimately responsible for the administration of the estate, including most significantly the safeguarding and responsible disposition of estate assets and their distribution to creditors. **We expect the trustee to make sure that all those persons to whom duties have been delegated do their jobs right—or else**.[26]

Judge Steven Rhodes observed that the trustee's duty to maximize the estate includes the

duty to minimize administrative costs:

> Many cases refer to the trustee's "duty to maximize the value of the estate." The more accurate formulation of this duty, however, is that the trustee is required to maximize the *distribution* of the estate. While this certainly requires the trustee to maximize the value of the estate, it also requires the trustee to minimize the administrative expenses of the estate.[27]

---

[25] *In re Delaware River Stevedores, Inc.*, 147 B.R. 864, 869-70 (Bankr. E.D. Pa. 1992); *accord In re Evans*, 153 B.R. 960, 968 (Bankr. E.D. Pa. 1993); *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 841 (3d Cir. 1994).

[26] *In re Abraham*, 163 B.R. 772, 779 (Bankr. W.D. Tex. 1994) (emphasis added).

[27] HON. STEVEN RHODES, *The Fiduciary and Institutional Obligations of A Chapter 7 Bankruptcy Trustee*, 80 Am. Bankr. L.J. 147, 164-65 (2006).

This duty includes knowing when to abandon an asset or action if the present or anticipated administrative costs will exceed the asset's net value to unsecured creditors.[28]

The United States Trustee also provides clear guidance: "A trustee shall not administer an estate or an asset in an estate where the proceeds of liquidation will primarily benefit the trustee or the professionals . . . . **The trustee must be guided by this fundamental principle** when acting as trustee." [29] Further, a "trustee may sell assets only if the sale will result in a meaningful distribution to creditors." [30]

The duty to economically administer estates includes a trustee's appropriate use of legal counsel. Trustees may employ counsel to advise on complex legal matters, or to represent the trustee in contested matters or adversary proceedings.[31] However, routine, uncontested tasks such as the turnover of tax refunds or avoidable transfers without a complaint, review of consumer claims, sale of personal property, and boiler-plate legal pleadings do not always require legal assistance. This is particularly true in this District where all trustees are seasoned attorneys.

---

[28] *Id.*

[29] U.S. DEP'T OF JUSTICE, EXECUTIVE OFFICE FOR U.S. TRUSTEES, HANDBOOK FOR CHAPTER 7 TRUSTEES (Oct. 1, 2012), 4-1 ("U.S. Trustee Handbook") (see *www.justice.gov/ust/file/Handbook_for_Chapter_7_Trustees.pdf/download*) (emphasis added).

[30] *Id.* at 4-14.

[31] *In re Holub*, 129 B.R. 293, 296 (Bankr. M.D. Fla. 1991) ("In general, professional time is limited to those tasks performed while representing the trustee in the prosecution of contested matters and adversary proceedings, attendance at court hearings in the capacity of attorney or other professional when the trustee has an interest, the preparation of professional related applications, and the performance of other specialized services that cannot be performed practically or lawfully by the trustee without engaging the services of a professional."); *In re Crutcher Transfer Line, Inc.*, 20 B.R. 705, 711 (Bankr. W.D. Ky. 1982) ("[F]or the services of an attorney to be chargeable as a cost of administration, the attorney must 'exercise professional legal skill and expertise beyond the ordinary knowledge and skill of the trustee.'") (citations omitted).

When counsel assumes too many of the trustee's responsibilities, it can result in a denial of compensation.[32] The United States Trustee program offers the following guidelines as to a trustee's use of estate professionals:

> The threshold question for the employment of any professional is the necessity of employment. The trustee must determine whether the services of a professional are needed and whether the cost is warranted. Further, the trustee needs to determine at the outset the level of professional work required and the estimated costs and benefits associated with the work.[33]
> . . . .
> The trustee may not be employed as counsel or accountant to provide services that a trustee could perform without professional assistance.[34]
> . . . .
> Professionals may not be compensated for performing work that the trustee can do without professional assistance.[35]

The Court concurs with these standards. Before delegating a task to counsel, trustees should first analyze whether the value of the task, less projected legal and administrative costs, is reasonably likely to benefit unsecured creditors.[36] The trustee should then regularly monitor counsel's fees to ensure that the services are necessary to the estate's administration or reasonably likely to benefit unsecured creditors.

The Court has previously expressed its concern to both the Trustee and to Special Counsel when their administration of estate assets did not benefit unsecured creditors.[37] The Court's

---

[32] *See In re Virissimo*, 354 B.R. 284 (Bankr. D. Nev. 2006) (Court denied counsel's fees for doing trustee duties, including preparing applications to employ counsel, handling uncontested motions, and responding to requests for information regarding the estate.).

[33] U.S. Trustee Handbook at 4-19.

[34] *Id.* at 4-20.

[35] *Id.* at 4-24.

[36] *In re All Island Truck Leasing Corp.*, 546 B.R. 522, 533 (Bankr. E.D.N.Y. 2016) ("Prior to administering an asset of the estate, a trustee must determine that doing so will fulfill the aforementioned duty—a trustee must prospectively analyze whether an asset will provide a net benefit, after payment of necessary secured claims and costs of administration, that will be distributable to unsecured creditors.").

[37] *See* Case No. 12-33607 (Special Counsel settled litigation for $25,000 but incurred fees of $27,577 (Dkt. Nos. 35 and 37)); Case No. 15-26203 (Trustee received $1,205 from debtor's buy-back of non-exempt equity in a vehicle and $104 in tax refunds; however, Trustee incurred $980 in attorney's fees to his firm and $327 in commission, resulting in no return to unsecured creditors) (Dkt. Nos. 20 and 22)).

concerns are augmented by the fact that the Trustee routinely, if not exclusively, hires Special

Counsel to represent him. As noted by one court:

> The symbiosis between some trustees and their regular counsel is too obvious to
> miss by any standard except willful blindness. The same trustees routinely hire the
> same one or two attorneys at all times, regardless of the issue. The trustees become
> all too willing to pay any rate for any service that the court approves. The attorney
> will provide fantastic personal service and free the trustee's time for other paying
> endeavors while the trustee's commission is calculated as a fixed expense.
> . . . .
> The disconnect is that the American legal system is an adversarial system, and this
> piece of the bankruptcy system has no adversary. Moreover, the client (the trustee)
> is not dealing with his or her own money. The front line responsibility for
> controlling the cost of legal services has been shifted from the trustees to the court.
> This is not how the system was designed to operate.[38]

In other words, like a private client, a trustee should regularly review, question, and if

appropriate, contest the legal fees of counsel to ensure that the estate receives fair value for the

administrative cost of services rendered.[39] As a fiduciary for unsecured creditors, the same

"jaundiced eye and scowling mien"[40] the trustee employs in bringing a $23,000 asset into the estate

should likewise be employed when reviewing an application for a $23,000 disbursement from the

estate. Further, the Trustee should not abdicate to the Court the responsibility to evaluate and adjust

professional fees. As noted above, "this is not how the system was designed to operate."[41]

In summary, as part of their duty to economically administer estates, trustees must manage

their professionals to ensure the services are not duplicative of trustee duties and are necessary to

---

[38] *In re Kieffer*, 306 B.R. 197, 211 (Bankr. N.D. Ohio 2004).

[39] *In re Butler Indus., Inc.*, 101 B.R. 194, 196 (Bankr. C.D. Cal. 1989) ("One of the responsibilities of a trustee is to
monitor all legal fees in the bankruptcy case, including those of the trustee's own legal counsel. The trustee has a
statutory duty to object to any fee application where the fees requested are not appropriate."). *See also In re Allied
Computer Repair, Inc.*, 202 B.R. 877, 884 (Bankr. W.D. Ky. 1996) (In reducing by half the fees of trustee's counsel,
the court noted that in the private sector, a client would not pay for such unproductive time, and "might even decide
not to return to that attorney for professional services in the future.").

[40] *Interwest Business Equip., Inc. v. United States Trustee (In re Interwest Business Equip.)*, 23 F.3d 311, 317 (10th
Cir. 1994).

[41] *In re Kieffer*, 306 B.R. at 211.

estate administration or reasonably likely to benefit unsecured creditors. When a trustee fails to conduct a cost-benefit analysis; to prepare a prospective budget for a task assigned to counsel; to regularly monitor counsel's fees; to regularly assess the advisability of pursuing an asset; and, when administrative fees render an estate insolvent, to take appropriate curative action, then the trustee has not economically managed the estate.

### C.   Professional Fees Must be Necessary to the Estate's Administration or Beneficial to Unsecured Creditors

Chapter 7 professionals are entitled to "reasonable compensation for actual, necessary services."[42] However, "the court **shall not allow** compensation for . . . services that were not . . . reasonably likely to benefit the debtor's estate or necessary to the administration of the case."[43] Unnecessary services include tasks that belong to the trustee.[44] Benefit to the estate is measured by an actual or reasonably anticipated return to unsecured creditors.[45]

"If a bankruptcy court determines a proposed fee is unreasonable, it may 'award compensation that is less than the amount of compensation that is requested.'"[46] The burden is on the party requesting fees to prove they are reasonable.[47] However, as in this case, that burden is more difficult when the services resulted in no benefit to unsecured creditors.[48]

---

[42] § 330(a)(1)(A).

[43] § 330(a)(4)(A)(ii) (emphasis added).

[44] U.S. Trustee Handbook at 4-24.

[45] *In re All Island Truck Leasing Corp.*, 546 B.R. 522, 534 (Bankr. E.D.N.Y. 2016) ("Services are, therefore, not compensable unless they were reasonably likely to provide a benefit to unsecured creditors."); *In re New England Metal Co., Inc.*, 155 B.R. 38 (Bankr. D. R.I. 1993) (administrative fees denied where it was reasonably apparent at the time of such services that there would be no distribution to unsecured creditors).

[46] *In re Commercial Fin. Servs., Inc.*, 427 F.3d 804, 812 (10th Cir. 2005) (quoting § 330(a)(2)).

[47] *Id.* at 811.

[48] *In re Unitcast, Inc.*, 214 B.R. 992, 1009 (Bankr. N.D. Ohio 1997) ("[W]hen a professional's efforts have failed to produce a significant benefit, the task of proving the reasonableness of the fees to the Court becomes unsurprisingly more difficult.").

**D.    Benefit to the Estate and the Reasonably Obvious Standard**

In reviewing fees, the court should objectively assess the benefit to the estate based on facts known, or that should have been known, to the applicant at the time of the services.[49] As noted by one court:

> This is not an instance of second-guessing the trustee in a retrospective analysis at the end of the case. It is very definitely an *ex ante*, and not an *ex post*, approach that is mandated by the trustee's statutory duty of maximizing the proceeds of distribution to the creditors, net of administrative expenses, and distributing those proceeds as expeditiously as possible.[50]

In making this objective assessment, a court should determine whether it was, or should have been, "reasonably obvious" that the administrative costs of pursuing an asset would render the estate insolvent.[51]

**E.    Section 330(a)(3) and the Johnson Lodestar Factors**

The Tenth Circuit specifically requires the Court to consider § 330(a)(3) and the "Johnson Factors" to assess the reasonableness of attorney's fees.[52] Section 330(a)(3) directs that courts consider the nature, extent, and value of the services, taking into account all relevant factors, including: (A) the time spent on such services; (B) the rates charged for such services; (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (E) with respect to a professional person,

---

[49] *In re McLean Wine Co., Inc.*, 463 B.R. 838, 848 (Bankr. E.D. Mich. 2011) (the court should focus on facts known or that should have been known at critical points during the administration of the case).

[50] *In re C. Keffas & Son Florist, Inc.*, 240 B.R. 466, 474 (Bankr. E.D. N.Y. 1999).

[51] *In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995) (the trustee's duty required the abandonment of an avoidance action "once it became reasonably obvious that further litigation would cost more than it was likely to bring into the estate.").

[52] *Mkt. Ctr. East Retail Prop., Inc. v. Lurie (In re Mkt. Ctr. East Retail Prop., Inc.)*, 730 F.3d 1239, 1247 (10th Cir. 2013) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

The Johnson Factors are somewhat duplicative of § 330(a)(3): (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

The Johnson Factors focus on whether the fee is reasonable relative to the skill of the attorney, the difficulty of the task, the market rate for similar services, and the results obtained. Applying these factors, the Court finds that the legal issues were neither novel nor difficult, the tasks did not require extraordinary legal skill, they did not involve undesirable work, and there were no time limitations, other than the motion to extend the objection to discharge deadline. The Court is not taking issue with Special Counsel's ability or customary fee. Rather, its focus is on the Johnson Factors relating to the time required, the amount involved, and the results obtained.

## V.     Analysis of the Applications

### A.     Special Counsel's Fees Relating to the Lots

The Court's primary concern is that Special Counsel began incurring significant fees without first performing appropriate due diligence to determine whether its services relating to the Lots were reasonably likely to benefit the estate. As previously stated, the Chapter 7 trustee and his or her professionals "must prospectively analyze whether an asset will provide a net benefit, after payment of necessary secured claims and costs of administration, that will be distributable to

unsecured creditors."[53] Based on what was known about the problematic features of Lot #9, the Court cannot find that there was a reasonable expectation that Special Counsel's extensive services would result in a return to unsecured creditors.

The Debtors' bankruptcy papers disclosed that they sold Lot #9 for $1,000, and that Lot #11 was worth $25,000 but subject to a lien of $35,550. Early in the case, the Debtors provided the 2015 property tax assessments that valued Lot #9 at $660 and Lot #11 at $25,000. The Debtors also provided a plat map showing that a main access road cut Lot #9 in half, along with a detailed list of the building issues with Lot #9. The Debtors, through their former realtor, explained that these factors created significant access and construction impediments making Lot #9 worth much less than Lot #11. The Trustee also knew that in the year before the bankruptcy filing, the Debtors had unsuccessfully attempted to sell the Lots for $74,900.[54]

Not that the Trustee should have unquestionably accepted the Debtors' representations, but the reported problems with Lot #9 were specific, supported by objective documentation, and subject to easy verification. This information, coupled with the materially lower tax value of Lot #9, should have put the Trustee and Special Counsel on notice that there was indeed something problematic with Lot #9.

---

[53] *In re All Island Truck Leasing Corp.*, 546 B.R. at 533; *In re Haugen Constr. Serv., Inc.*, 104 B.R. 233, 241 (Bankr. D. N.D. 1989) ("[A] trustee, cognizant of his fiduciary role, must avoid spurious lawsuits as well as those which, while having theoretical legal merit, would be unduly expensive to the estate, involve undue risk to the estate or likely result in minimal recovery for the estate.") (citation omitted); *Surf N Sun Apts., Inc. v. Dempsey*, 253 B.R. 490, 494 (M.D. Fla. 1999) ("Before undertaking . . . [litigation], the trustee must, however, complete a cost-benefit analysis to determine whether the contemplated litigation is in the best interests of *all* creditors. Relevant factors include realistic assessments of the probability of success, the potential net benefit to the estate, and the litigation burden on the estate in terms of time and cost.").

[54] Docket No. 61 at p. 4.

At the second hearing on the Application, Special Counsel proffered that the Trustee thought each Lot was worth $40,000 because the plat map showed them to be the same size,[55] and the Trustee did not know Lot #9 was unbuildable.[56] The Court is not convinced. Given the detailed and verifiable information regarding the building problems with Lot #9, it was not reasonable for the Trustee to believe it was worth $40,000. An appropriate analysis of the available information regarding the Lots, coupled with minimal due diligence to verify or contradict it, should have resulted in an early determination that the combined value of the Lots was closer to $60,000 rather than $80,000.

Further, the Trustee had sufficient facts to run a hypothetical sale of the Lots using different values to calculate possible net proceeds. This analysis would have shown the need to monitor Special Counsel's fees to ensure they were not rendering the estate insolvent. The Court ran such a hypothetical sale calculation based on information available to the Trustee during the first few months of the case.[57] Neither the Trustee nor Special Counsel provided evidence of a similar analysis to establish that they were proactively and thoughtfully administering the estate to maximize the return to unsecured creditors.

---

[55] January 22, 2018 Hearing at 2:23:42 p m. to 2:24:08 p.m.

[56] January 22, 2018 Hearing at 2:25:58 p.m. to 2:26:06 p.m. ("Lot 11 was the buildable lot. Lot 9, although unbeknownst to the Trustee at this time, was a non-buildable lot.")

[57]

| Sale Price of Lots | Closing Costs (8%) | Lien on Lot #11 | Trustee Commission | Net to Estate |
|---|---|---|---|---|
| $40,000 | $3,200 | $35,550 | $4,750 | ($3,500) |
| $50,000 | $4,000 | $35,550 | $5,750 | $4,700 |
| $60,000 | $4,800 | $35,550 | $6,250 | $13,400 |
| $70,000 | $5,600 | $35,550 | $6,750 | $22,100 |
| $80,000 | $6,400 | $35,550 | $7,250 | $30,800 |

In addition, Special Counsel billed considerable time (anywhere from $3,500 to $4,300) attempting to determine the value of the Lots.[58] These services do not merit compensation. First, valuing lots is not compensable time for trustee's counsel.[59] Second, Special Counsel's inaccurate valuation of the Lots contributed to a net loss of over $9,500 to the estate. Third, for much less the Trustee could have paid for a professional appraisal of the Lots. In the alternative, the Trustee's realtor, who ultimately received a $3,630 commission,[60] could have physically inspected the property to verify the issues with Lot #9. Instead, the Trustee relied on the realtor's "desktop appraisal" of the Lots.[61] Clearly the Lots could have been accurately valued, because a year later the Trustee listed them for $59,000 and quickly sold them for $60,500. However, by this time, Special Counsel's fees far exceeded the net sale proceeds – even without the Trustee's commission.

Again, what the Court finds most concerning is that Special Counsel began incurring significant fees without a prudent analysis as to whether its services were reasonably likely to benefit the estate. And when the cost of those services turned out to far exceed the predictable net proceeds from the sale, Special Counsel unabashedly petitioned the Court for the full amount of its fees with no exercise of billing judgment and little justification for such an outcome.

For the reasons stated above, the Court finds that with reasonable due diligence, Special Counsel and the Trustee could have accurately valued the Lots at the beginning of the case. With

---

[58] Docket No. 76.

[59] *See In re Virissimo*, 354 B.R. 284 (Bankr. D. Nev. 2006) (time spent by trustee's counsel in talking with realtor, arranging for appraisal, and deciding on listing price were trustee duties and thus not compensable).

[60] Docket No. 80.

[61] January 22, 2018 Hearing at 2:31:59 p.m. to 2:32:39 p.m. ("We asked for uncompensated assistance from Pauline Webber, who is a real estate agent with Mountain West Realty, to verify the prepetition listing of Gary Black which we had not verified. . . . She did verify that . . . and she performed a desktop appraisal. She did not go out and visit the property.")

such a valuation, the Trustee and Special Counsel should have projected the total administrative costs to recover and sell the Lots. They then should have monitored their administrative fees to avoid billing the estate into insolvency.[62] Because the Trustee and Special Counsel did not do so, the Court finds that Special Counsel's services were not reasonably likely to benefit the debtor's estate when they were performed under § 330(a)(4)(A).

While it is true the Lots netted $15,846.34 to the estate, the $27,500 in administrative expenses consumes any benefit to unsecured creditors. Under the facts of this case, if the Court awarded all net proceeds to the Trustee and Special Counsel, it would be contrary to the directives of the Code, applicable caselaw, and the U.S. Trustee guidelines that estates should not be administered for the sole, or even primary, benefit of professionals, and that a trustee should only sell an asset if it will result in a meaningful distribution to creditors. Thus, other than the allowances set forth below, the Court finds no basis to award compensation to Special Counsel for its services relating to the recovery and sale of the Lots.

### B.    Failure to Disclose the Estate's Insolvency at the Time of the Sale

In addition to no return to unsecured creditors, the Court is troubled that the estate's insolvency was not disclosed in the motion to sell the Lots.[63] The motion's language led the Court, and presumably creditors, to believe that the sale would generate a return to unsecured creditors:

> The Trustee seeks authority to pay liens, interests, fees and costs at closing in the sum of $44,573.01, as more specifically set forth in the preceding paragraph. After payment of all liens and interests, $15,926.99 proceeds remain. **The remaining proceeds will be held by the Trustee to pay creditors of the estate pending further Order of the Court.**[64]

---

[62] *See Peoples Bank & Trust Co. v. Burns*, 95 Fed. Appx. 801, 806 (6th Cir. 2004) ("In exercising his discretion for the benefit of the bankruptcy estate and its creditors, the Trustee was obliged to undertake a cost-benefit analysis before moving to avoid the post-petition transfers.") (citation omitted).

[63] Docket No. 69, Motion for Order Authorizing Sale of Real Property Free and Clear of Liens and Interests.

[64] *Id.* at p. 5 (emphasis added).

However, the motion does not disclose that at this time accrued attorney's fees alone totaled $20,303. Obviously, the estate's insolvency was known or reasonably knowable at the time of the motion, and this fact should have been acknowledged and addressed in the sale motion. As noted in the similar case of *In re Jiminez*:

> Viewed in light of the maximum allowable compensation under § 326(a), the sale was, in itself, administratively insolvent, and by a wide margin. The Trustee chose not to mention that fact in the Sale Motion, and neglected to make any assessment of the impact his compensation was likely to have on the ultimate benefit of the sale to unsecured creditors. He led those creditors to believe the sale would likely result in a significant benefit to them, but then proceeded to deplete that benefit by litigating the surcharge issue, apparently without regard to a cost-benefit analysis. **Although the court agrees with the Trustee that trustees are not guarantors of a dividend to unsecured creditors, neither are unsecured creditors guarantors of the Trustee's compensation.**[65]

This failure to disclose a material fact regarding the status of the estate at the time of the sale is additional cause for the Court to deny compensation for services relating to the sale of the Lots. As noted in *Jiminez*, unsecured creditors are not the guarantors of a professional's fees. Special Counsel had the most control over keeping its fees commensurate with the reasonably projected benefit from selling the Lots. Under these circumstances, the Court finds that shifting 100% of the loss to unsecured creditors, while paying 100% of Special Counsel's requested fees, is inconsistent with the intent of § 330(a)(3) and (4).

Further, the First Circuit has held that the underlying authority for Chapter 7 asset liquidation is the realization of equity for the benefit of unsecured creditors.

> Bankruptcy courts have defined the equity that justifies a sale of property, consistently and explicitly, in one way: the value remaining for unsecured creditors above any secured claims and the debtor's exemption. **It is this equity for unsecured creditors that authorizes a trustee to liquidate the property in the first place** . . . .[66]

---

[65] *In re Jiminez*, No. 05-91112-D-7, 2008 WL 954174, at *5 (Bankr. E.D. Cal. Apr. 7, 2008) (emphasis added).

[66] *In re Traverse*, 753 F.3d 19, 29 (1st Cir. 2014) (emphasis added) (citation omitted).

Thus, going forward, Utah trustees should include in a motion to sell under § 363 an analysis of the projected benefit to unsecured creditors, after deducting secured claims, costs of sale, trustee's commission, and accrued attorney's fees. If the trustee does not or cannot provide such an analysis, the Court will question the propriety of the sale. If the estate is administratively insolvent, that fact should be fully disclosed in the motion with an explanation and, if appropriate, a proposed carve-out from professional fees to ensure a meaningful return to unsecured creditors.

### C.    Legal Services for Tasks Belonging to the Trustee

Special Counsel seeks compensation for services that the Trustee should have performed. Trustee's counsel is "never entitled to compensation for performing duties which the [Code] imposes upon the trustee."[67] Further, retained attorneys should only be compensated for legal services and not for routine administrative matters.[68] Although employed as "special counsel," a review of the time entries indicates that Special Counsel was involved in more than just "litigation or resolution of complex issues," but it handled essentially every aspect of case administration.[69]

### 1.    "Sale of Property" Services

The Application requests $8,493.50 under the category "Sale of Property."[70] A paralegal billed 75% of the fees in this category.[71] The majority of time entries involve the paralegal's

---

[67] *In re Shades of Beauty, Inc.*, 56 B.R. 946, 949 (Bankr. E.D. N.Y. 1986); *see also In re Meadows Operations, Inc.*, No. 04-34702, 2007 WL 2915813, at *9 (Bankr. D. Utah 2007) ("[A] court should not approve professional compensation for carrying out the Trustee's duties."); *In re J.W. Knapp Co. v. Porter, Wright, Morris & Arthur*, 930 F.2d 386, 387-88 (4th Cir. 1991) ("A trustee's administrative duties are set out in 11 U.S.C. § 704. While the code authorizes employment of professionals for representation and assistance, the legislative history indicates that lawyers were contemplated to do the former rather than the latter.").

[68] *See In re All Island Truck Leasing Corp.*, 546 B.R. 522, 535 (Bankr. E.D. N.Y. 2016).

[69] Docket No. 85, Supplement, p. 3.

[70] Docket No. 76.

[71] *Id.* Under the category of "Sale of Property," Special Counsel's paralegal billed 45 hours or $6,330 out of the total of $8,493.50 requested in this category.

communications with the Trustee, the real estate agent, the title company, and potential buyers.

The services also cover essentially all aspects of the sale such as deciding the sale price, preparing

the listing agreement, making counteroffers, seeking the uncontested employment of the realtor,

communicating with the buyer, shuttling communications between the realtor and the Trustee,

deciding the terms of the real estate contract, drafting conveyance documents, etc. Such services

are not compensable by the estate.[72] Administrative costs could have been substantially reduced if

the Trustee had simply directly communicated with the real estate agent, the title company, and

potential buyers.

Included in this category is $2,306 for Special Counsel to employ the real estate agent.

Much of this time involves the attorney and paralegal reviewing and revising the application and

order. However, there is nothing novel about the application or order, and much of the language is

boilerplate. Indeed, in simple cases, trustees should prepare applications to employ realtors or

accountants as they are seldom contested and routinely granted.

In short, none of the services to effectuate the actual sale of the Lots involved contested or

complex legal matters that required the assistance of legal counsel. Indeed, when a sale of property

is routine and uncontested, the Trustee should directly handle the administrative aspects of its

liquidation.[73] For the reasons stated above, all amounts under the category "Sale of Property" are

disallowed.

---

[72] *In re Virissimo*, 354 B.R. 284 (Bankr. D. Nev. 2006) (Court denied counsel's fees for doing trustee duties, including time spent talking to realtor, arranging for appraisal, deciding on listing price, reviewing title reports, responding to offers, making counteroffers, preparing application for uncontested 2004 exam, drafting uncontested motions, and communicating with information seekers.).

[73] *See In re Meadows Operations Inc.*, No. 04-34702, 2007 WL 2915813, at *11-12 (Bankr. D. Utah 2007) (attorney compensation denied for time communicating with auctioneer and title company because such actions are a trustee's responsibility); *In re Kusler*, 224 B.R. 180, 194 (Bankr. N.D. Okla. 1998) ("A trustee is not entitled to hire a lawyer to communicate with an auctioneer regarding the details of an upcoming sale.").

### 2.    Review of Motion for Relief from Stay

In the "Administration" category, Special Counsel billed approximately $400 to review motions for relief from stay and to seek the Trustee's direction on further action.[74] Special Counsel took no action on the motions. Trustees should generally review such motions and then contact counsel if they require legal representation.[75] Compensation is denied for these services.

### D.    Services to Recover Lot #9

The Application seeks $5,059 for services categorized as "Resolution of Gary Black Lien" that relate to the recovery of Lot #9. It was reasonable for the Trustee to employ counsel to pursue this matter. But as set forth above, the Trustee should first have exercised more due diligence in valuing Lot #9 and then monitored Special Counsel's fees to ensure they did not create a net loss to the estate. Furthermore, the Court finds that the time spent on the "resolution of the Gary Black Lien" is not commensurate with the complexity of the matter or the results obtained. Many of the time entries in this category are duplicative and excessive. Approximately one-third of the fees billed in this category are attributed to a paralegal.[76] Upon further review, many of the time entries relate to internal conferences between the firm's attorneys and/or the paralegal.[77]

The services in this category evidence Special Counsel's excessive time spent on matters that are not complex and should be routine for counsel that regularly represents an experienced

---

[74] *See* Docket No. 76, Special Counsel's Application, Exhibit B (Time entries dated 6/9/16; 7/1/16; 7/5/16; 7/10/16; and 8/11/16).

[75] *See In re Dreibelbis*, No. 14-61483, 2015 WL 3536102, at *13 (Bankr. N.D. Ohio 2015) ("An objection to a motion for relief from stay is a 'routine' trustee matter . . . . [The creditor's] objection contains no unusual complexity, is very short, is within a trustee's normal expertise, and therefore will be disallowed.") (citations omitted).

[76] Docket No. 76, Special Counsel's Application, Exhibit D. A paralegal at Special Counsel's Firm billed $1,657 out of the total $5,059 requested in the Resolution of Gary Black Lien category.

[77] Based on a review of the time entries, the Court calculates approximately $908 was billed for Special Counsel's internal meetings and/or conferences.

Chapter 7 Trustee, such as drafting a demand letter for the turnover of property or prosecuting an uncontested motion to approve a settlement agreement. For example, the time entries reveal that Special Counsel billed $758.50 (3.7 hours) to draft a demand letter to Gary Black in April 2017.[78] While the Court has not examined the demand letter, it is hard to imagine how a demand letter for the turnover of a recreational lot as an alleged fraudulent transfer would require an attorney experienced in representing chapter 7 trustees over 3 hours to draft. The Court finds that that such time spent is excessive and reduces it by half. Fees of $380.00 are allowed for this task.

In addition, 25% of the time entries in this category, equaling $1,329.50, are for Special Counsel's work preparing and prosecuting the uncontested motion to approve the settlement agreement with Gary Black.[79] This does not include time spent negotiating or drafting the settlement agreement itself, but simply preparing the motion and obtaining an order from the Court. The Motion is five pages long, and the facts and legal analysis therein are neither lengthy nor complex. The Court finds that that such time spent is excessive and reduces it by half. Fees of $665.00 are allowed for this task.

For these reasons, and because the combined sale of the Lots did not result in a benefit to unsecured creditors, the Court allows $1,045.00 in compensation but denies the balance requested under this category.

## 1.    Investigation of Transfer of Lot #9

Special Counsel argued that the integrity of the bankruptcy system required it to investigate and recover Lot #9 because the $1,000 sale price strongly suggested fraud.[80] There is no indication

---

[78] Docket No. 76, Special Counsel's Application, Exhibit D (Time entries dated 4/10/17; 4/17/17).

[79] Docket No 76, Special Counsel's Application, Exhibit D (Time entries dated 5/2/17; 5/5/17; 5/8/17; 5/24/17; 6/19/17; 6/21/17; 6/26/17; 7/19/17; 7/21/17).

[80] Docket No. 23, Trustee's Motion to Extend Deadline for Filing Complaint Pursuant to 11 U.S.C. § 727, p. 2.

in the Debtors' bankruptcy papers or their responses to the Trustee that they sold Lot #9 with

fraudulent intent. Indeed, the Debtors fully disclosed this transfer in their Statement of Financial

Affairs. Thus, the transfer more correctly involved constructive fraud based on an appearance of

inadequate consideration. The authority to recover constructively fraudulent transfers is based on

the policy of returning assets to the estate for an equitable distribution to creditors. If the

prosecution of an avoidance action only benefits estate professionals, then such an action

diminishes, rather than enhances, the integrity of the bankruptcy system. Second, if the Trustee

and Special Counsel had accurately valued Lot #9, they could have made an informed decision

about how much attorney time could be spent on this matter before its recovery created a net loss

to the estate. If pursuit of an avoidance action will cost more than the estate will realize, then it

should be abandoned. This is another basis to deny fees for services relating to Lot #9.

### E.      Investigation of Assets

The Application shows $3,561.50 billed under the category, "Investigation of Assets."[81]

Almost all of these entries relate to valuing the Lots in connection with either the alleged fraudulent

transfer or to determine a sales price. Approximately $495.60 of the charges are for internal

communications between counsel and the firm's paralegals. For the reasons expressed above, these

services should have been performed by the Trustee or another professional. Also, they were not

reasonably likely to benefit the estate when they were performed, and they did not benefit the

estate.

Further, over half of the entries in this category, or $2,021.50 spanning an 8-month period,

relate to drafting an *ex parte* motion for a Rule 2004 examination of the Debtors and for the

---

[81] Docket No. 76, Special Counsel's Application, Exhibit C.

production of documents ostensibly relating to the Lots.[82] The Court finds that the time spent on this matter is excessive considering the lack of information gained and the results obtained. Motions for a Rule 2004 examination do not require notice or hearing and are readily granted by the Court. Moreover, the time entries do not show that a Rule 2004 examination was ever conducted, and it does not appear that the request for documents gleaned information beyond what the Debtors had already disclosed in their bankruptcy papers or their Objection to the Motion to Extend Discharge.[83] However, Special Counsel's time of $338 was reasonable for its initial evaluation of the case, including reviewing the Debtors' bankruptcy papers and listening to the § 341 meeting recording. Therefore, all fees in this category, except for $338, are disallowed.

### F.    Extension of Time to Object to Discharge

Included in Special Counsel's Application under "Administration" are charges for obtaining an extension of time to object to the Debtors' discharge.[84] At the hearing, Special Counsel argued that its services in investigating a possible objection to the Debtors' discharge were reasonable and necessary even if they would not result in a return to unsecured creditors. While the Trustee did not file an objection to discharge, the Court agrees that some of these services were necessary. The Court allows fees of $1,258 for time spent preparing the motion, reviewing the Debtors' response, and attending the hearing.

However, the Court denies fees of $860 (4.3 hours)[85] to prepare for the hearing as it was not reasonable for Special Counsel to assume that the Court would conduct an evidentiary hearing at a preliminary hearing on the motion. At the hearing on its Application, Special Counsel

---

[82] Docket No. 76, Special Counsel's Application, Exhibit C (Time entries from 8/26/16 to 4/10/17).

[83] Docket No. 28, Debtors' Objection and Response to Trustee's Motion to Extend Deadline for Filing Complaint Pursuant to 11 U.S.C. § 727.

[84] Docket No. 76, Special Counsel's Application, Exhibit B.

[85] *See* Docket No. 76, Special Counsel's Application (Time entries dated 7/6/16; 7/11/16).

explained that extensive preparation was necessary because of the evidentiary issues raised by the Debtors. The Court is unconvinced.

The matter was set as a preliminary hearing on the law and motion calendar along with many other Chapter 7 hearings. Matters on this calendar are preliminary hearings scheduled at five-minute intervals. Special Counsel knows this is the Court's practice.[86] The purpose of this procedure is to avoid what happened in this case; namely, that neither the Court nor the parties will waste time if the matter is ultimately uncontested, settled, or narrowed in scope. Thus, it was not reasonable to bill four hours preparing for a preliminary hearing scheduled for five minutes. Consistent with the purpose of this procedure, the hearing was ultimately uncontested and only required three minutes for the Trustee to obtain an order extending the deadline to object to discharge. Fees of $860 are disallowed.[87]

### G.    Failure to Exercise Billing Judgment

Finally, Special Counsel's Application fails to exercise billing judgment in that it seeks compensation for every six minutes spent on this case. Evidence of appropriate billing judgment is "an absolute requirement of fee applications in bankruptcy."[88] "Counsel for a chapter 7 trustee are expected to exercise the same manner and type of 'billing judgment' that they would exercise for private clients."[89] This includes objectively reviewing the application before its submission to

---

[86] United States Bankruptcy Court for the District of Utah, Judge Kevin R. Anderson Chamber Procedures, Scheduling and Calendar Matters, Law and Motion Calendar, https://www.utb.uscourts.gov/content/judge-kevin-r-anderson. The concept behind a preliminary hearing is that the Court and the parties will have the opportunity to determine if there is a contested issue of fact or law. If so, the Court and the parties will decide the length of time needed for a final hearing, and if a scheduling order is required regarding discovery and the submission of briefs.

[87] Docket No. 33, Recording from July 12, 2016 Hearing.

[88] *In re Maxine's, Inc.*, 304 B.R. 245, 249 (Bankr. D. Md. 2003) (citation omitted).

[89] *In re McLean Wine Co.*, 463 B.R. 838, 852 (Bankr. E.D. Mich. 2011) (quoting *In re Kusler*, 224 B.R. 180, 185 (Bankr. N.D. Okla. 1998)).

the Court to remove excessive or unproductive time entries. Discounting attorney time is particularly appropriate when the cost of the services exceeds the value they produce for the estate.[90]

In its supplement to the fee application, Special Counsel proposed a "voluntary reduction" of $22,221.50 to $12,646.56.[91] However, this offer is not "voluntary," and it does not constitute billing judgment. It is merely an acknowledgment of the fact that Special Counsel's services left the estate with insufficient funds to pay its fees in full. Further, even with this reduction, all estate funds will go to the Trustee and Special Counsel, and unsecured creditors will still receive nothing.

When trustees and their professionals seek fees in administratively insolvent estates, they should exercise billing judgment with voluntary reductions sufficient to create a return to unsecured creditors. If the professionals believe the estate's insolvency was not reasonably foreseeable, they should come forward with evidence of due diligence such as how and when the assets were valued; evidence of a prospective budget estimating the costs of avoiding, recovering, and/or liquidating assets; evidence of trustee management and supervision of counsel to scale back, settle, or terminate unprofitable litigation or collection efforts; and explanations as to why the trustee's valuations and cost projections did not result in a distribution to unsecured creditors.[92] Otherwise, the Court will exercise its discretion in making adjustments to compensation consistent with the criteria set forth herein.

---

[90] *See In re Allied Computer Repair, Inc.*, 202 B.R. 877, 880 (Bankr. W.D. Ky. 1996) (fees of $12,000 reduced by half when trustee's counsel only recovered $15,000 from adversary proceeding).

[91] Docket No. 87, Second Supplement.

[92] *See In re Shades of Beauty, Inc.*, 56 B.R. 946, 950-51 (Bankr. E.D.N.Y. 1986).

### H.    Allowed Fees & Costs to Special Counsel

In summary, the Court allows $1,258.00 for services regarding the motion to extend time to object to the Debtors' discharge; $380.00 for drafting the demand letter to Mr. Black; $665.00 for preparing the motion to the approve the settlement with Mr. Black; $338.00 for time spent on the initial case review; and $255.00 for time preparing the fee application. Thus, the Court awards Special Counsel $2,896.00 in fees and $853.44 in costs, for a total of $3,749.44.

### I.    The Trustee's Commission

The Court has expressed its concerns about the Trustee's oversight and management of this case. The Trustee is seeking a commission of $4,484.72. Based on the Final Report, the maximum compensation permitted under § 326(a) is $6,394.72. Thus, the Trustee has reduced his commission by $1,910. While the Tenth Circuit has not specifically addressed § 326(a) since the 2005 amendments to the Bankruptcy Code,[93] the majority of courts hold that the calculation of the trustee's commission under § 326 creates a presumptively reasonable fee that should only be adjusted in rare or extraordinary circumstances.[94] Therefore, because the Trustee has voluntarily reduced his commission request, because the Court does not at this time wish to test the boundaries of § 326, and because the Trustee has subsequent duties to perform with the disbursement of funds to unsecured creditors, the Court will allow the Trustee's commission in the amount of $4,484.72

### VI.    Conclusion

For the reasons set forth above, the Court finds that Special Counsel provided some services that the Trustee should have done and other services that were unnecessary, duplicative, or excessive. The Court finds that other services were not reasonably likely to benefit the estate

---

[93] The most recent Tenth Circuit decision on § 326 is *In re Miniscribe Corp.*, 309 F.3d 1234 (10th Cir. 2002).

[94] *See Lejeune v. JFK Capital Holdings, L.L.C. (In re JFK Capital Holdings, L.L.C.)*, 880 F.3d 747, 753 (5th Cir. 2018).

when they were performed. The Court also finds that the services were not reasonable given the amount of time expended, the amount of money at issue, the absence of difficulty, and the results obtained. Considering the information available at the beginning of the case, and in the absence of a valid assessment of the value of the Lots and a cost-benefit analysis of administering the Lots, the Court finds that Special Counsel should have known that the excessive extent of its services was not reasonably likely to benefit the estate.

Finally, the Court is particularly troubled by the following: (1) Special Counsel knew or should have known that the estate was insolvent at the time of filing the motion to sell the Lots, yet did not disclose that fact in the motion; (2) when it filed its Application, Special Counsel knew that its services had rendered the estate insolvent, yet it still sought 100% of its fees without adequate justification; and (3) after two hearings wherein the Court expressed its concerns about the administration of estates for the sole benefit of professionals, Special Counsel did not exercise meaningful billing judgment or adequately explain what steps were taken to avoid billing the estate into insolvency.

Absent extraordinary circumstances that are not reasonably foreseeable, trustees and counsel should avoid rendering estates administratively insolvent from the pursuit of assets. The Court is cognizant that the litigation of complex transactions that have the potential for significant returns to the estate also involve significant risk. The Court will balance those factors in such cases. But this estate involved a straight-forward, prepetition transfer and the sale of recreational lots. The problem here is the over-lawyering of an elementary Chapter 7 case that rendered the estate administratively insolvent. If Special Counsel had been conservative and circumspect in the time it put into this case, this outcome may have been avoided – even with the Lots selling for $60,500.

The national Chapter 7 reports for 2016 show that, on average, for every dollar collected by Chapter 7 trustees, 33 cents went to administrative fees and costs while 20.7 cents went to nonpriority, unsecured creditors.[95] These are impressive results. The U.S. Trustee does not break down this data by state, so the Court cannot determine how Utah fares relative to this national average. Nonetheless, striving to keep Chapter 7 administrative costs at 33% while returning 20% to general unsecured creditors is a worthy goal.

Therefore, the Court awards Special Counsel $2,896.00 in fees and $853.44 in costs, for a total of $3,749.44 but denies all other fees requested in the Application. The Court allows the Trustee's requested commission of $4,484.72 and costs of $35.00 for a total of $4,519.72. This results in total administrative costs of $8,269.16 leaving an estimated balance of $9,750.56 to be distributed to creditors. Thereafter, the Trustee shall file an amended final report. The Court will enter an Order consistent with this Memorandum Decision.

END OF DOCUMENT

---

[95] CHAPTER 7 TRUSTEE FINAL REPORTS, United States Department of Justice (Oct. 6, 2017), available at *https://www.justice.gov/ust/bankruptcy-data-statistics/chapter-7-trustee-final-reports.*

—ooo0ooo—

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing MEMORANDUM DECISION ON APPLICATIONS FOR
COMPENSATION (DOCKET NOS. 76 AND 81) AND FINAL REPORT (DOCKET NO. 80)
shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below,
are registered CM/ECF users:

- Adam S. Affleck  asa@pyglaw.com, debbie@princeyeates.com;
  docket@princeyeates.com; andalin@princeyeates.com
- J. Kevin Bird  jkevinbird@birdfugal.com
- J. Kevin Bird tr  jkevinbird@birdfugal.com, kbird@ecf.epiqsystems.com;
  kbtrustee@aol.com; melanie@birdfugal.com
- Tom Cook  lundbergecfmail@lundbergfirm.com, ecfmaildistgroup@lundbergfirm.com
- Blakely Denny  bdenny@swlaw.com, nharward@swlaw.com; docket_slc@swlaw.com;
  sballif@swlaw.com
- Mark S. Middlemas  LundbergECFmail@Lundbergfirm.com,
  ecfmaildistgroup@lundbergfirm.com
- J. Grant Moody  jgmoodylaw@cs.com
- C. Val Morley  morleypc.utahlaw@gmail.com, valjema@hotmail.com
- Tara W. Pincock  twp@princeyeates.com
- United States Trustee  USTPRegion19.SK.ECF@usdoj.gov
- Aaron M. Waite  aaronw@w-legal.com, JodyR@w-legal.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF
system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

None.